UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x
                                                                     :
HARTFORD FIRE INSURANCE COMPANY                                      :
a/s/o Sync Sound, Inc.,                                              :    Case No.: 07 Civ 2998 (NRB)
                                                                     :
                    Plaintiff,                                       :
                                                                     :
        -against-                                                    :
                                                                     :
CUSHMAN & WAKEFIELD, INC. and 444 REALTY                             :
COMPANY, LLC,                                                        :
                                                                     :
                    Defendants.                                      :
                                                                     :
-------------------------------------------------------------------- x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

                                        Robinson & Cole LLP
                                        Attorneys for Plaintiff
                                        885 Third Avenue, 28th Floor
                                        New York, New York 10017
                                        212-451-2900

Of Counsel:
        Michael B. Golden
        David E. Ross

NEWY1-635917-3

# TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................................................1

STATEMENT OF FACTS ..................................................................................................1

    1.    Description of the Building.................................................................................1

    2.    Cushman & Wakefield had knowledge of the roof leaks for at least one and a half years prior to the flood. ...........................................................3

    3.    Delayed hiring of Wiss Janney. .....................................................................5

    4.    The delay in repairing the roof continues under Enterprise's watch.....................6

    5.    When the flood occurred on August 14, 2005 it was determined that water penetrated two areas which had been leaking for over one year and which had been previously identified as problems by Wiss Janney. .................................7

    6.    Replacement of the roof after the flood .................................................................8

ARGUMENT ......................................................................................................................9

I.    NEW YORK COURTS HAVE CONSISTENTLY HELD THAT WAIVERS OF SUBROGATION DO NOT APPLY TO BREACH OF CONTRACT CLAIMS. ..............9

    A.    The waiver of subrogation clause does not bar Hartford's breach of contract claims against the landlord..........................................................................9

    B.    Public policy and principles of risk allocation underscore the inapplicability of the waiver to breach of contract claims. .....................................11

    C.    Hartford acknowledges that its negligence claim against the landlord is barred by the waiver of subrogation.....................................................................14

    D.    *Indian Harbor* is distinguishable. .........................................................................14

        i.    Judge Leisure affirmed *Viacom*'s holding that the waiver clause at issue does not apply to contract claims. ......................................................14

        ii.    *Indian Harbor* is inapplicable because of the different factual scenarios, and in the instant matter the Landord's intentional breach of the lease frustrated the risk allocation contemplated therein. ......................................................................................................15

E.  This Federal Court should apply New York law, as consistently applied by its appellate courts, which mandates that the subject waiver of subrogation provision does not encompass contractual claims. .................................................17

II.  THE WAIVER OF SUBROGATION PROVISION DOES  NOT APPLY TO THE MANAGING AGENT. ......................................................................................17

A.  The Managing Agent cannot rely on paragraph 9(e) as it is not a party to the Lease. ..........................................................................................................17

B.  There Are Questions of Fact Regarding Cushman & Wakefield's Negligence. ..................................................................................................18

III.  THE ANTI-SUBROGATION DOCTRINE IS INAPPLICABLE TO THIS ACTION AND IS NOT A BASIS FOR DISMISSAL. .......................................19

CONCLUSION..............................................................................................................21

## INTRODUCTION

Plaintiff Hartford Fire Insurance Company ("Hartford"), as subrogee of Sync Sound, Inc. ("Sync Sound"), submits this Memorandum of Law in opposition to defendants' motion for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure ("FRCP"). As demonstrated below, defendants cannot establish their entitlement to judgment as a matter of law because:

> (1) The waiver of subrogation provision in the parties' agreement does not preclude Hartford's breach of contract action against defendant 444 Realty Company, LLC ("444 Realty" or "Landlord") for its self-imposed delay and willful failure to repair the roof;
>
> (2) No lease provision succeeds in absolving defendant Cushman & Wakefield, Inc. from liability; and
>
> (3) The Anti-Subrogation rule does not apply to this case.

Accordingly, defendants' motion for summary judgment should be denied.

## STATEMENT OF FACTS

**1.    Description of the Building.**

We include, on the next page, a schematic diagram of the cluster of buildings in which Sync Sound's tenancy is located (Tomasi Ex. 1). The transcripts and deposition exhibits referred to below are submitted herewith in a separate binder.

The Building, designated as 444, 448 and 450 West 56th Street had three tenants: a multi-story New York City High School (High School of Environmental Sciences) essentially occupying portions A, B and C as well as the hatched section; Interboro College (which has recently closed) occupying the multi-level building designated as D and E, and Sync Sound which occupied the ground floor of the College at D and E.

1



North



The Building is owned by defendant 444 Realty Company LLC which appears to have delegated management of the Building to the non-party, Enterprise Asset Management ("Enterprise"). In turn, defendant Cushman & Wakefield, Inc. was hired by the Building owner to directly manage the day-to-day operations of the Building.

**2.    Cushman & Wakefield had knowledge of the roof leaks for at least one and a half years prior to the flood.**

Cushman & Wakefield had the responsibility to maintain the roof in good repair, as described by Debra Tomasi who was employed by it to manage the Building (Tomasi Ts. at 23-4):

> Q.    Now, in terms of the maintenance and repair of the roof, what was the scope of Cushman & Wakefield's responsibility?
>
> A.    Okay, so for the areas that we were responsible for, we wanted to make sure that the roof was policed and clean, that any physical problems with the roof would have been under our purview to address.

However, while Cushman & Wakefield was aware of leaks at the College (whose ground floor was occupied by Sync Sound) at least as early as April 1, 2004 – and probably earlier – it did nothing to repair them.

Shortly after becoming manager of the Building, Ms. Tomasi solicited proposals from engineering firms to locate the sources of the roof leaks. The proposal from WJE Engineers & Architects, P.C. ("Wiss Janney") (Tomasi Ex. 3) recited what they were told about the leaks at their April 1, 2004 site visit.[1]

---

[1]    Heriberto Pagan was the superintendent of the building for the years prior to the flood, which occurred on August 14, 2005 and for a period of time thereafter. Despite diligent efforts, we have not been able to locate him in order to take his deposition.

> Based on our April 1, 2004 site visit, we understand that there is
> one existing water leak at 444 at the bulkhead of Stairwell E, two
> existing water leaks at 448 (one near the roof drain at the
> southwest corner of the building and one at the north stair
> bulkhead). We further understand that there are two water leaks
> at 450 along the parapet at Tenth Avenue and along the low slope
> roof adjoining 440.

Ms. Tomasi identified at least two of the above-described areas on the roof diagram,

which areas turned out to be a source of the water intrusion on August 14, 2005 (Tomasi Ex. 1,

Tomasi Ts. at 67-70).[2] See areas "2" and "3" on the D and E portions of the above diagram.

While Ms. Tomasi's recollection was not entirely clear, it appears that Cushman &

Wakefield had knowledge of these leaks long before April 1, 2004. Cushman & Wakefield's

documents reflect that it had knowledge of leaks at 448 and 450 (450 was the College and Sync

Sound) at least as early as March 24, 2004, based on an Enterprise agenda item,[3] and probably

much earlier based on Ms. Tomasi's email to Steven Perry stating that such complaints preceded

her employment at Cushman & Wakefield in February 2004 (Tomasi Ex. 7):

> As we have discussed, dating back to Bert's [Ms. Tomasi's
> predecessor] involvement with the property, we have received
> ongoing complaints from both the High School and the College
> about multiple leaks in the Tenants demised space.

Ms. Tomasi further testified that she received ongoing complaints about roof leaks *after*

she started managing the Building (Tomasi Ts. at 90-91):

> Q.    And did you continue to get those calls, you know,
>        through 2004, do you recall from time to time?
>
> Mr. Biondo:  You mean for the entire year of 2004?

---

[2]    See, for example, the report of our expert Rick Watsky (Stieve Ex. 5) which identified the source of the
water intrusion as the same areas identified by Ms. Tomasi.

[3]    The item reads as follows: "444-450 West 56th Street - 1. Roof – a) leaks 448 and 450." Tomasi Ex 2.

> Q.    Yes, through the year 2004, when it rained, a minor leak here or there?
>
> A.    Yeah, I think we did have several calls about leaks during severe rain.

Despite the continuing nature of the leaks, Ms. Tomasi testified that no repairs were made to the roof until after the flood which occurred on August 14, 2005 (Tomasi Ts. at 92).

**3.    Delayed hiring of Wiss Janney.**

Although Cushman & Wakefield was aware of the leaks in the Building at least as early as March 1, 2004, they did not actually retain Wiss Janney to do an analysis until approximately September 14, 2004 (Tomasi Ts. at 98-99).

As part of Wiss Janney's investigation, it retained a company called Jersey Infrared Consultants which issued a report on November 19, 2004 (Tomasi Ex. 11) identifying wet spots on the roof.[4]

Although Jersey's report identified ten different areas of moisture damage (two of which were where the water entered on August 14, 2005), neither Cushman & Wakefield, Enterprise, nor 444 Realty did anything in response (Tomasi Ts. at 100).

Wiss Janney's final report was issued on February 14, 2005 (Tomasi Ex. 12) reflecting the results of its investigation of the roof. Wiss Janney's witness, Douglas Stieve testified "that the report indicates findings of conditions that may lead to a water leak or be the cause of a water leak in the future." These conditions, numbering in the *dozens*, were specifically identified in the report and were reviewed at Mr. Stieve's deposition. Among the problem areas identified on

---

[4]    The wet spots do not necessarily mean that the roof is leaking is those places, but that water has penetrated the outer roof membrane.

February 14, 2005 were the two areas where the water came in six months later on August 15, 2005.[5]

The testimony of Cushman & Wakefield and Enterprise was that Cushman & Wakefield's involvement with the Building's roof essentially terminated when the Wiss Janney report was issued on February 15, 2005, with responsibility shifting to Steven Perry, Director of Construction at Enterprise.

**4.     The delay in repairing the roof continues under Enterprise's watch.**

Mr. Perry received the Wiss Janney report on or about February 14, 2005, and although the report identified numerous problem areas with the roof, Enterprise did nothing until after the flood on August 14, 2005.  The reasons appear to be efforts by Enterprise to find a low cost alternative to replacing the roof and the fact that roof repairs were not in the owner's budget for that year.

Mr. Perry testified that he accepted Wiss Janney's analysis of the roof problems and knew that repairs had to be made (Perry Ts. at 46), testifying as follows:

> Q.     So is it fair to say after your Wiss Janey report, your job was
>          to make the necessary repairs at a reasonable price?
>
> A.     Yes.
>
> Q.     And that's why you spoke to Mr. Fusco and that's why I
>          take it you sought some additional bids, right?
>
> A.      Yes.

Mr. Perry promptly solicited a bid for the roof repair, which was received on March 23, 2005 in the amount of $691,125 (Perry Ex. 3), but Mr. Perry testified that he wanted additional

---

[5]     See: (i) Stieve Ex. 5, the Watsky report dated October 23, 2006; (ii) Stieve Ex. 6, the Wiss Janney report dated February 14, 2005; and (iii) Stieve Ex. 4, which transposes Watsky findings of where the water entered (L1 and L2) with the problems areas identified by Wiss Janney about six months prior to the flood, areas no. 2 and 5.

bids to see if the original one (by Concord Restoration, which ultimately replaced the roof) was reasonable. Indeed, two additional bids were received on May 16, both in amounts at least $70,000 more than Concord's bid (Perry Exs. 4 and 5), yet Enterprise still did nothing.

Mr. Perry explained that the delay continued because he had to do "due diligence, namely he was looking for the contractor which had originally installed the roof approximately 10 years earlier to determine if there was an outstanding warranty (Perry Ts. at 52-54). By June or July 2005, when Mr. Perry was unable to locate the contractor or warranty, he referred the matter to the building owner – which was non-responsive (Perry Ts. at 54). Mr. Perry explained that there was no sense of urgency and that one of the reasons no action was taken was probably because there was no money in the Building's budget for roof repairs that year (Perry Ts. at 55-6):

> Q.    So there was no sense of urgency?
>
> A.    Not that there wasn't a sense – no, truthfully, no. We knew we wanted to have it done and we wanted to do it. I imagine there were other matters that they were discussing. There was no money in the budget, so maybe they had to move money around. Normally you would get the repairs year by year by year by year.

In fact, Ms. Tomasi testified that from the time she became Building manager in early 2004 and until *after* the flood, no roof repairs had ever been made (Tomasi Ts. at 36).

**5.    When the flood occurred on August 14, 2005 it was determined that water penetrated two areas which had been leaking for over one year and which had been previously identified as problems by Wiss Janney.**

After the flood, plaintiff's expert Rick Watsky did an investigation and identified two areas on the roof where the water penetrated: by the parapet flashing on the 10th Avenue side of roof D and an area in the trough between two barrel roofs. These are identified on Watsky's report as areas 1 and 2.

As noted above, Wiss Janney identified these two as problem areas in their February 14, 2005 report, issued six months before the flood, and Steve Perry, based on his conversations with the roofer who eventually replaced the roof, confirmed that water entered through the flashing in the 10th Avenue side of the Building (Perry Ts. at 63-66).   Debra Tomasi identified these areas as those which leaked in April 2004, over one year before the flood.

**6.     Replacement of the roof after the flood**

Steve Perry testified that after the flood, he entered into a contract with Concord Restoration to replace the roof for the exact amount contained in Concord's original estimate issued five months earlier on March 23, 2005 (Perry Ts. at 52 and Perry Exs. 3 and 9).

## ARGUMENT

I.    **NEW YORK COURTS HAVE CONSISTENTLY HELD THAT WAIVERS OF SUBROGATION DO NOT APPLY TO BREACH OF CONTRACT CLAIMS.**

    A.    **The waiver of subrogation clause does not bar Hartford's breach of contract claims against the landlord.**

Paragraph 9(e) of the Lease - the waiver of subrogation provision - provides in pertinent part:

> Nothing contained herein above shall relieve Tenant from liability that may exist as a result of damage from fire or other casualty. Notwithstanding the foregoing, each party shall look first to any insurance in its favor before making any claim against the other party for recovery for loss or damage resulting from fire or other casualty, and to the extent that such insurance is in force and collectible and to the extent permitted by law, Landlord and Tenant each hereby releases and waives all right of recovery against the other or any one claiming through or under each of them by way of subrogation or otherwise.  The foregoing release and waiver shall be in force only if both releasors' insurance policies contain a clause providing that such a release or waiver shall not invalidate the insurance.

Defendants here improperly rely on this provision to assert that this bars Hartford's breach of contract claim against the Landlord.  However, this argument simply ignores over 20 years of well-settled New York state case law which has interpreted this *identical* waiver of subrogation provision to not encompass breach of contract claims.  *Gap, Inc. v. Red Apple Cos.*, 282 A.D.2d 119, 125, 725 N.Y.S.2d 312 (1st Dep't 2001) (holding that waiver of subrogation clauses apply, if at all, only to tort-based claims not claims premised on contractual liability); *St. Paul Fire & Marine Ins. Co. v. Protection Mutual Ins. Co.*, 644 F. Supp. 38, 40 (S.D.N.Y. 1986);

*Viacom International, Inc. v. Midtown Realty Co.*, 193 A.D.2d 45, 602 N.Y.S.2d 326 (1st Dep't 1993).[6]

For example, in *St. Paul*, the court held that the landlord was contractually obligated to pay to repair the tenant's leasehold improvements under paragraph 9(b) of the lease and that the waiver of subrogation provisions in paragraph 9(e) only applied to tort based liability.

In a thorough analysis of paragraph 9(e), the identical form lease at issue here, the court held:

> St. Paul would have us judge para. 9(e) without regard to the rest of the lease. When para. 9(e) is read in conjunction with the rest of para. 9 the plain meaning of the words dictate the conclusion that para 9(e) does not even apply to the instant situation.

*Id.* at 40.

Referring to paragraph 9(e) which begins "Nothing contained hereinabove shall relieve Tenant from liability that may exist as a result of damage from fire or other casualty" - the same language at issue in the matter at bar - the court said that the clause does not apply to contractual liability and held:

> The requirement that the parties look to their own insurance before making a claim against the other applies only to tort based liability under the first sentence of para 9(e), not to liability under the lease/contract generally.

Similarly, in *Viacom*, the Appellate Division, First Department endorsed the court's analysis in *St. Paul* holding, "[w]e agree with the St. Paul court's analysis that the waiver of

_____

[6] It is important to note that the Lease in this case as well as the leases in *St. Paul*, *Viacom* and *Gap* all come from an identical form lease. If defendants wanted additional protection from breach of contract claims, they could have amended this language to something that the Court have not consistently held does not encompass breach of contract claims. They failed to do so and therefore should be bound by its terms and the Court's consistent interpretation of ¶ 9 (e).

subrogation clause at issue also does not encompass contract claims." *Viacom*, 193 A.D.2d at 52.

It further held, "[a]s *St. Paul* (*supra*) recognized with respect to this particular clause, the waiver

is limited to subrogation claims premised on tort liability. In all other respects, the parties' rights

and obligations under the lease as to the various contingencies that might arise in such a

relationship are clearly spelled out." *Id.* at 53.

Finally, in 2001, the Appellate Division, First Department again affirmed the holding of

*Viacom* by holding that a waiver of subrogation clause (which is identical to the clause in the

lease between the parties in this case) did not encompass contractual claims. *Gap, supra,* 282

A.D.2d at 125. In that regard, the Appellate Division definitively declared: "the waiver of

subrogation clause, whose provisions apply, if at all, only to tort-based claims, not claims

premised on contractual liability." *Id.*

It is indisputable that the defendant landlord breached the parties' lease through its willful

failure to repair the roof from at least April 1, 2004 to the time of the flood on August 14, 2005.

As set forth in *Viacom*, *St. Paul* and *Gap*, paragraph 9(e) of the parties' Lease is clearly

inapplicable to such a breach of contract claim. Additionally, the purpose of a waiver of

subrogation is to permit allocation of the risk of loss for negligence. Its purpose is not to permit

a landlord from benefiting from its continuing and willful breach of its contractual obligations.

**B.    Public policy and principles of risk allocation underscore the
inapplicability of the waiver to breach of contract claims.**

The courts have, correctly, upheld the validity of waiver of subrogation clauses as a

legitimate devise which contracting parties may use to allocate the "risk of loss" and avoid

litigation. As stated in *Viacom*, supra:

Rather than exempting the parties from liability... such clauses merely reflect their allocation of the risk of liability, as between themselves, to third parties through the device of insurance.

*Viacom* at 53.

This sensible policy rationale has no applicability when a loss is caused by one party's willful breach of contract.

If the courts *extended* the waiver to cover breaches of contract the result would be that landlords could cut corners, defer maintenance and ignore legitimate safety and other building issues knowing that their tenants' insurance carriers would pay for any losses while the landlord cloaks itself with "waiver of subrogation" immunity.

Surely, this is not type of risk allocation contemplated by parties when they execute a lease. On the other hand, by limiting waivers to tort claims, the landlord and *its* insurance carrier is held responsible for the landlord's willful acts; the landlord's insurance premiums may rise; and the *landlords* carrier may take any one of various measures to correct the landlord's misbehavior to minimize its losses in the future. Landlords would not be playing with "house money" and would be less likely to "roll the dice" and allocate unbargained for risk to their tenants.

Additionally, a waiver of subrogation clause only works when both parties are on a level playing field, but it does not work when a party intentionally and knowingly avoids its legal obligations just to save money. The waiver of subrogation clause is dependent upon the landlord and tenant shifting only such risks that were contemplated and agreed upon by the parties. Surely, it was not the intent of the parties to shift any and all risks upon Hartford, including the defendants' knowledge of severe problems with the building's roof, a minimum 17 month delay in repairing the roof and their *admitted failure* to allocate enough money for this vital building

repair. This behavior is especially egregious considering that the defendants were gladly taking Sync Sound's substantial rent payments over this extended time period but shortchanged their budget for necessary roof repairs.

Although defendants attempt to distinguish the holding of *Liberty Mutual Insurance Co., v. Perfect Knowledge*, 752 N.Y.S.2d 677, 299 A.D.2d 254 (2004), the premise of that case, to wit, that the risk shifting envisioned under the waiver of subrogation clause could not take place and the agreement was frustrated as a whole, is directly on point. *Id.* at 526. Instead of making timely repairs of a well-known problem, the Landlord chose to "roll the dice" and ironically now seeks protection from the tenant's insurance carrier. Such a scenario is not only a violation of public policy but also belies the implied covenant of good faith and fair dealing inherent in every contract. Further, it also places a unilateral burden on a tenant for its landlord's flagrant and intentional breaches of a commercial lease.

Additionally, a landlord acting in such an egregious manner not only increases the potential for a tenant's property damage, it could also harm the tenant by subjecting them to an increased insurance premiums. As set forth in the accompanying affidavit of John Beres ("Beres Aff."), a Vice-President employed by Hartford who oversees underwriting practices for property insurance, loss history of the insured is one factor used to determine premiums. To that end, Mr. Beres states that if an insured suffers a loss their premiums may be higher. On the other hand, Mr. Beres also affirms that if Hartford recovers some or all of the loss in a subrogation action, Hartford will usually take that recovery into account to the benefit of the insured.

Bearing in mind the facts of this case, it is clear that if the Landlord is permitted to absolve itself for its intentional and flagrant breach of contract, not only is Hartford damaged in the form of a large casualty payout by (in this case $427,975.58), but Sync Sound's premiums

could potentially be increased by the selfish, intentional acts of a landlord that avoided its legal

obligations just to save some money.  Clearly, both the shifting of the payout by Hartford and the

potential for higher insurance premiums to Sync Sound due to the Landlord's intentional breach

of the Lease is not the type of risk allocation contemplated by the parties.

> **C.    Hartford acknowledges that its negligence claim against the
> landlord is barred by the waiver of subrogation.**

Hartford agrees that its negligence claims against the Landlord are barred by the waiver of

subrogation provision. Therefore, Hartford hereby withdraws that cause of action against the

Landlord.

> **D.    *Indian Harbor* is distinguishable.**

> **i.    Judge Leisure affirmed *Viacom*'s holding that the waiver
> clause at issue does not apply to contract claims.**

Simply put, the holding in *Indian Harbor* is distinguishable from the instant matter

because the waiver of subrogation clause in *Indian Harbor* differs from the clause in this case,

and this clause was held not to bar contractual claims in *Viacom*, *Gap* and *St. Paul*.  In fact, in

*Indian Harbor*, Judge Leisure made it clear that he was not overruling *Viacom*'s holding, to wit,

that the language of the waiver in *Viacom* (and in this case) did not bar breach of contract claims.

Rather, Judge Leisure held that the *Indian Harbor* clause was distinguishable from *Viacom*

because the *Indian Harbor* clause did not differentiate between tort-based and contract claims

(430 F.Supp.2d at 194) (emphasis supplied):

> While the Court recognizes that some courts have found certain
> waiver of subrogation provisions clauses to only preclude
> subrogation actions for negligence, but not for breach of contract,
> [citing, in a footnote, *Viacom* and *St. Paul* with approval] the
> Court believes that the subject clause does not so differentiate.

Likewise, defendants' reliance on *St. Paul Fire and Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 2005 U.S. App. LEXIS 9446 (2d Cir. 2005) is misplaced. Much like, *Indian Harbor*, the waiver of subrogation clause differed from this case as well as *Viacom*, *St. Paul* and *Gap*. More significantly, the court did not hold that a waiver of subrogation clause was a *per se* bar of contractual claims. Rather, it found that there was no breach of contract. Therefore, that case is clearly distinguishable from the instant matter.

> ii. ***Indian Harbor* is inapplicable because of the different factual scenarios, and in the instant matter the Landord's intentional breach of the lease frustrated the risk allocation contemplated therein.**

The facts here are easily distinguishable from *Indian Harbor*. Here, the landlord's breach of contract was continuing, inexcusable, documented, testified to, and ultimately disastrous.

In *Indian Harbor*, the "breach of contract" claim was creative and extraordinarily tenuous to the loss.

"Plaintiff claims that the fire was caused by the spontaneous ignition of certain vegetable oil-laden cotton fabrics that had been put in the dryer for drying [by defendant tenant]." *Indian Harbor* at 185. As an apparent afterthought, and in an amended complaint, plaintiff added a breach of contract claim, namely that tenant installed a soffit at an unspecified time before the fire without the landlord's permission and which blocked a sprinkler head.

Judge Leisure easily found that this alleged breach, some time before the fire, should not impact the risk allocation provisions of the waiver of subrogation clause, i.e. the clauses were not "dependent" and the tenant could still claim protection of the subrogation waiver.[7]

---

[7]     Reading between the lines of the Indian Harbor decision one gets the strong sense that Judge Leisure was not impressed with plaintiff's tardy breach of contract claim and perceived the matter as a straight-forward negligence claim.

We respectfully disagree that *Indian Harbor* applies since our breach of contract claim differs in kind and seriousness from that in *Indian Harbor*.

However, even if we apply *Indian Harbor's* analysis of "dependent" and "independent" clauses, the subrogation waiver cannot apply here.

The waiver of subrogation provision is a risk sharing provision that permits the parties to allocate risk. However, what the defendants fail to acknowledge is that their intentional delay in failing to repair the roof completely frustrated the risk allocation contemplated in the lease. Again, although defendants attempt to distinguish the holding of *Liberty Mutual Insurance Co., v. Perfect Knowledge*, 752 N.Y.S.2d 677, 299 A.D.2d 254 (2004), the premise of that case, to wit, that the risk shifting envisioned under the waiver of subrogation clause could not take place and the agreement was frustrated as a whole, is directly on point. *Id.* at 526. Instead of making timely repairs of a well-known problem, the Landlord chose to accept the (increasing) risk that a flood disaster would not occur and now ironically seeks protection from the tenant's insurance carrier when the flood finally occurred. Therefore, much like *Liberty Mutual*, the "risk allocation" provisions were frustrated based upon the Landlord's intentional failure to repair the roof.[8] *Liberty Mutual* at 526.

As a result, the Landlord's motion for summary judgment on the grounds that Hartford's breach of contract claims are barred by the waiver of subrogation should be denied.

---

[8]    When discussing contract interpretation in *Indian Harbor*, Judge Leisure stated: "whether covenants made by a lessor and lessee in their lease are dependent or independent of each other is to be determined by the intention and meaning of the parties, as expressed by them, and by the application of common sense to each case submitted for adjudication." *Indian Harbor* at 192, quoting *Greasy Spoon, Inc. v. Jefferson Towers, Inc.*, 551 N.E.2d 585, 587, 552 N.Y.S.2d 92 (1990). Applying common sense to the facts of this matter only yields one conclusion, that the parties never intended to make the allocation of risk envisioned in the waiver of subrogation absolute and limitless, regardless of a party's conduct.

E.    **This Federal Court should apply New York law, as consistently applied by its appellate courts, which mandates that the subject waiver of subrogation provision does not encompass contractual claims.**

A Federal Court sitting in diversity must give fullest weight to pronouncements of highest courts and when highest court has not resolved the dispute, a federal court must apply what it finds to be the state law after giving proper regard to relevant rulings of other courts of state. *Kline v. E.I. DuPont de Nemours & Co., Inc.*, 15 F.Supp.2d 299 (W.D.N.Y. Jul 16, 1998). It is respectfully submitted that this Court, should apply the law as set forth by the Appellate Divisions in *Viacom* and *Gap*. Those cases, as well as *St. Paul* decided in this court, contained identical waiver of subrogation clauses to the one at bar and held that such clauses did not bar breach of contract claims. Moreover, in *Indian Harbor*, Judge Leisure had ample opportunity to overrule the holding in *Viacom*, but he chose not to do so. Instead, he distinguished the clause in *Indian Harbor* and left the holding of *Viacom* undisturbed.

Hartford respectfully suggests that the Court should defer to the New York State Court's interpretation of the waiver of subrogation clause and find that breach of contract claims are not barred by the subject waiver of subrogation provision.

II.    **THE WAIVER OF SUBROGATION PROVISION DOES NOT APPLY TO THE MANAGING AGENT.**

A.    **The Managing Agent cannot rely on paragraph 9(e) as it is not a party to the Lease.**

The only entities that are parties to the Lease are 444 Realty and Sync Sound. Defendant Cushman & Wakefield, the Managing Agent, is not a party to the Lease. Nonetheless, defendant argues that it is entitled to the protections afforded by the waiver of subrogation provision in the

17

Lease. In attempting to argue this point, defendants point to sections of the lease which contain language in the lease that begins "Landlord or its agents." (Defendants' Memo of Law p. 15). However, what defendants fail to point out is while other portions of the Lease expressly protect the "Landlord or its agents" from certain liabilities, the waiver of subrogation clause only contains the term "Landlord" and does not contain the language "Landlord or its agents." In other words, when the Landlord wanted to protect its Managing Agent in the Lease, it knew how to add the appropriate language and did so in other portions of the Lease.

No such protection is contained in the waiver of subrogation clause and the Court should not add language to the Lease protecting the Managing Agent which the Landlord could have negotiated at the inception of the lease or during subsequent amendments. Therefore, Hartford's negligence claim against Cushman & Wakefield survives.

**B.    There Are Questions of Fact Regarding Cushman & Wakefield's Negligence.**

Despite defendants' arguments to the contrary, there clearly are questions of fact regarding Cushman & Wakefield's negligence. First, as set forth in the Affidavit of Michael B. Golden, Cushman & Wakefield's request for summary judgment is premature because post-deposition discovery relevant to Cushman & Wakefield's negligence remains outstanding, specifically building logs and incident reports which may well document the history of roof leaks. Second, Ms. Tomasi's testimony, to wit, that Cushman & Wakefield knew the roof needed to be repaired but did little if anything to ensure that it was, is prima facie proof of Cushman & Wakefield's negligence.

Additionally, while Cushman & Wakefield was aware of leaks at the College (whose ground floor was occupied by Sync Sound) at least as early as April 1, 2004 – and probably earlier – it did nothing to repair them.

Based upon these facts, the negligence of Cushman & Wakefield is clearly a question for the jury.

### III.    THE ANTI-SUBROGATION DOCTRINE IS INAPPLICABLE TO THIS ACTION AND IS NOT A BASIS FOR DISMISSAL.

The anti-subrogation rule is not applicable because the landlord is not an insured on the only policy at issue in the litigation:  Sync Sound's property policy.

While the landlord is an additional insured on Sync Sound's liability policy, the courts recognize that first party property and third party liability polices are entirely different animals, insure mutually exclusive risks, and the anti-subrogation rule *never* applies in property litigation just because the separate liability policy names the landlord as an additional insured.

Although "an insurer has no right of subrogation against its own insured with respect to claims arising from the very risk for which the insured was covered", *Rosato v. Karl Koch Erecting Co., Inc.*, 865 F.Supp. 104 (E.D.N.Y. 1994), defendants' argument ignores the distinction – recognized by all courts which have considered the question – between property coverage and liability coverage.  In *Great Northern Ins. Co. v. Mount Vernon Fire Ins. Co.*, 92 N.Y.2d 682, 685 N.Y.S.2d 411, 708 N.E.2d 167 (1999), the Court of Appeals observed:

> Insurance contracts generally are assigned to one of two classes: either "first-party coverage" or "third-party coverage".  "First-party coverage" pertains to loss or damage sustained by an insured to its property; the insured receives the proceeds when the damage occurs.  In contrast, if the insurer's duty to defend and pay runs to a third-party claimant who is paid according to a judgment or settlement against the insured, then the insurance is classified as

> "third-party insurance". Thus, wholly different interests are
> protected by first-party coverage and third-party coverage.

*Id.* at 687.

Additionally, in the case of *The Gap, Inc. v. Fireman's Fund Insurance Co.*, 782 N.Y.S.2d 242,

11 A.D.3d 108 (App. Div. 1st Dep't. 2004), the Appellate Division, First Department affirmed

the holding of *Great Northern*. Specifically, in *Fireman's Fund*, despite the fact that the

defendant was an additional insured under plaintiff's liability policy, the court permitted the

plaintiff to sue the defendant for property damage because they were not an additional insured on

plaintiff's property insurance policy. *Id.* at 112. In coming to that conclusion, the court again

relied upon *Great Northern's* distinction between "first-party coverage" and "third-party

coverage." *Id.* Further, in permitting the plaintiff's suit to move forward, the court also aptly

noted the distinction between liability insurance and property insurance:

> The principal distinction between liability and property insurance
> cover's one's liability to *others* for bodily injury or property
> damage, while property insurance cover's damage to one's *own*
> property.

*Fireman's Fund* at 112.

Much like the insurance policy in *Fireman's Fund*, the insurance policy issued by

Hartford contains two coverage parts which are each self-contained and *cover entirely separate*

*risks*: (1) Building and Property Coverage; and (2) Commercial General Liability Coverage. The

damages that Hartford seeks to recover in this case were paid in accordance with its obligation to

provide "first-party" coverage to Sync Sound since the loss was to Sync Sound's property.

Accordingly, the exclusion contained in the Commercial General Liability Coverage part of the

Policy, upon which defendants rely and which applies only to claims made by third-parties, is

inapplicable to this action.

Therefore, the anti-subrogation doctrine is inapplicable.

## CONCLUSION

For all the foregoing reasons, with the exception of dismissal of Plaintiff's negligence

claim against the Landlord, defendants' motion for summary judgment pursuant to FRCP 56(b)

should be denied.

Dated: New York, New York
       February 1, 2008

                       Robinson & Cole LLP

                       By:
                       Michael B. Golden (MBG-0133)
                       David E. Ross (DR-1513)
                       Attorneys for Plaintiff
                       Hartford Fire Insurance Company
                       885 Third Avenue, 28th Floor
                       New York, New York 10022
                       (212) 451-2900

## CERTIFICATE OF SERVICE

I, Michael B. Golden, hereby certify that on this 1st day of February, 2008, I served a true copy of the foregoing PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT via regular mail, postage pre-paid, upon the following:

> James Biondo, Esq.
> Rosenblum Newfield, LLC
> 50 Main Street, 10th floor
> White Plains, NY  10606

Michael B. Golden  (MG-0633)